# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Martin Breaker, Heidi Breaker, and Marty Breaker Enterprises, Inc., | Case No. 10-cv-2141 (SRN/LIB) |
| Plaintiffs, | |
| | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| United States of America; Tom Vilsack, in his official capacity as Secretary of Agriculture of the United States Agriculture Department; Thomas Tidwell, Chief of the Forest Service of the United States Department of Agriculture; James W. Sanders, Forest Supervisor; and Nancy Larson, District Ranger, | |
| Defendants. | |

James A. Yarosh, Jennifer Kolias, and Mark H. Thieroff, Siegel Brill P.A., 1300 Washington Square, 100 Washington Avenue South, Minneapolis, MN 55401, for Plaintiffs.

David W. Fuller and Bahram Samie, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

## I.      INTRODUCTION

This matter is before the Court on the parties' cross motions for summary judgment and Defendants' motion to dismiss.  (Pl.'s Mot. for Summ. J. [Doc. No. 34]; Def.'s Mot. to Dismiss or for Summ. J. [Doc. No. 44].)  Both parties ask the Court to grant judgment as a

matter of law upon a review of an administrative decision by the United States Forest Service. Defendants also seek dismissal based on lack of jurisdiction. For the following reasons, the Court finds that the Forest Service's decision was arbitrary and capricious, remands the case to the Forest Service for further consideration, denies Plaintiffs' request for declaratory and injunctive relief, and denies Defendants' motion to dismiss.

## II. BACKGROUND

### A. The Property

#### 1. General Background

Plaintiffs Martin and Heidi Breaker own an eighty-acre parcel of undeveloped land ("the Property"), located approximately twenty-five miles northwest of Ely, Minnesota. (AR 42-43; SAR 2378.) Situated between the Moose River on the west and the Portage River on the east, the Property lies entirely within the Boundary Waters Canoe Area Wilderness ("BWCAW"), which is part of the Superior National Forest.[1] (AR 221.) The Portage River crosses a portion of the Property at the northeast corner. (Id.)

The Property has been owned privately since 1908, when the United States General Land Office patented it to an individual named W. Alfred Kiley. (AR 206.) The parcel was ultimately obtained by John Salvi in 1949, (AR 55-58), and passed to his successor Charles Salvi sometime between 2001 and 2003. (SAR 2009-10.) The record does not show that the Property was ever developed by anyone, or that any motorized vehicle has been there.

---

[1] Established in 1909, the Superior National Forest encompasses approximately 3.9 million acres, approximately two-thirds of which is owned by the United States and managed by the United States Forest Service.

### 2. Sale of the Property to Plaintiffs

Around 2000, the Salvi family wrote a representative of the Superior National Forest, offering the Property for sale. (AR 228-29.) The Forest Service conducted an appraisal and made an offer for the Property. (AR 211.) The Salvis rejected this offer, instead selling the Property to Marty Breaker Enterprises, Inc., a company created for commercial and investment purposes. (AR 215; SAR 138, 141-43.) Mr. Breaker "made it very clear" to the realtors that he wanted the Property for use in a land exchange with the Forest Service. (SAR 742-43.) Mr. Breaker's other potential use for the Property was to build a private home. (SAR 160-61, 172.) Neither Mr. Breaker nor any representative of Marty Breaker Enterprises, Inc. visited the Property before the purchase. (SAR 188, 745.) On August 13, 2009, Marty Breaker Enterprises, Inc. conveyed the Property to Martin and Heidi Breaker. (SAR 2023.)

### 3. Access to the Property

No road provides ingress or egress to the Property. (AR 43.) The closest public road, Forest Service Road 206A ("FR 206A"), is between 1.25 to 1.50 miles from the Property. (SAR 587-88.) An old road connects to FR 206A and runs northeasterly into the BWCAW toward the Property. (SAR 560-61, 1176.) This road is a narrow, faint trail that is overgrown with trees and brush. (AR 3; SAR 1176, 1821-26.) It continues for approximately one mile, reaching county-owned property that lies adjacent to the west side of the Breakers' property. (SAR 587, 1176.) At that point, the road ends and one must walk through the forest approximately a quarter to a half mile to reach the Property. (SAR 587-88, 1176.)

The Portage River crosses into the northeast corner of the Property. (AR 221; SAR 1176.) Shallow and rocky, the Portage River is not navigable for most of the year. (AR 214.) Employees of the Forest Service with knowledge of the Property have confirmed the difficulty of reaching the Property via the Portage River. (AR 212.) Mr. MacMillan, the lessee of the county property, described the Portage River as a "very bad route" to the Property. (SAR 833.) He does not know anyone who uses that river. (Id.)

## B. Plaintiffs' Request for Access to the Property and the Forest Service's Subsequent Investigation

When he purchased the Property, Mr. Breaker believed that the old logging road continued all the way to the Property rather than ending on the county land. (SAR 229, 744, 774.) Around June 2005, Mr. Breaker contacted Nancy Larson,[2] then District Ranger for the LaCroix Ranger District, to request a special use permit application for motorized access to the parcel by reopening the old road. (AR 4; SAR 2386.) Mr. Breaker did not mention any intent to build a home on the Property. (AR 7-8, 11-12; SAR 2386-87.)

From June to July of 2005, District Ranger Larson evaluated Mr. Breaker's request. The Forest Service's investigation consisted in part of District Ranger Larson's conversations with employees at the Superior National Forest headquarters, who had been

---

[2] District Ranger Larson served as the District Ranger for Superior National Forest's LaCroix District from February 2005 until November 2009, during which she was responsible for all decisions related to resource management in the LaCroix District. (SAR 2385.) District Ranger Larson had worked for the Forest Service since 1989, serving as a Recreation and Wildlife Manager and Deputy District Ranger at other national forests, where she managed special use and wilderness programs. (Id. at 2385-86.) From 2009 to 2012, District Ranger Larson worked for the Chippewa National Forest. (Id. at 2385.) She now serves as the Gunflint District Ranger at Superior National Forest. (Id.)

4

employed at the Forest Service for many years. (SAR 2387, 2393-94.) One employee was Barb Soderberg, Wilderness Program Manager, who had responded to prior requests for access from other landowners whose property was similarly surrounded on all four sides by wilderness. (SAR 2393.) Ms. Soderberg indicated that she was not aware of any situations, either in the Superior National Forest or elsewhere, in which the Forest Service had granted motorized access through federally designated wilderness where such access did not exist before the wilderness designation. (Id.) Another employee was Diana Solund, Superior National Forest's Land Program Manager, who mentioned that Mr. MacMillan had leased a hunting cabin for years on the county-owned land adjacent to the Property. District Ranger Larson learned from Ms. Solund that in 1982, a prior District Ranger had asked Mr. MacMillan to stop accessing his cabin with a motor vehicle in light of the 1978 BWCAW Act. (SAR 2394; AR 33-39.)

In addition, District Ranger Larson asked Tim Engrav, Natural Resource Recreation Manager of the LaCroix Ranger District, to gather information about the nature of access to the Property. (SAR 558, 2387.) Mr. Engrav and a fellow Ranger District employee, Mark Toot, flew over the area to examine access points for river and walking access to the Property. (SAR 558-59.) Mr. Engrav memorialized his observations in a field report dated July 13, 2005. (AR 3.) The report noted seven to eight sets of rapids to the Breaker property, the challenge of portaging or pulling over the rapids, and the absence of maintained portages around the rapids. (Id.) To access the Property by walking, Mr. Engrav reported the existence of FR 206A and that it "dead ends at a berm/closure and turn-around area." (Id.) Evidence of the road, according to Mr. Engrav's report, was faint. (Id.)

Based on reports from other Forest Service staff, Mr. Engrav noted that the road went as far as the county property that lay west of the Property.  (Id.)  From the air, Mr. Engrav observed a faint line of the road for a short distance north of the turnaround.  (Id.)

At District Ranger Larson's request, Mr. Engrav researched access to private inholdings in the wilderness.  (SAR 2392-93.)  Based on a search of the Wilderness.net website, Mr. Engrav found an article on wilderness inholdings.  (AR 190-95; SAR 561-62, 2392-94.)  Mr. Engrav also retrieved summaries of court decisions showing that motorized access had not been granted where it did not exist before its wilderness designation.  (AR 181-89, 196-98; SAR 561-62.)  Mr. Engrav provided his research findings to District Ranger Larson, but he did not give her a summary, conclusion, or recommendation as to how she should proceed with Mr. Breaker's request.  (SAR 562-63.)

As part of the investigation, the Forest Service did not:

- Walk to the Property or the old road toward the Property;

- Canoe the Portage River from the Echo Trail to the Property;

- Investigate the use or access of the other privately owned properties within the BWCAW;

- Create a list of the privately owned properties within the BWCAW;

- Ask Mr. Breaker his intended use of the Property;

- Review the Saint Louis County zoning code to see the legal uses of the Property; or

- Determine what would constitute reasonable use and enjoyment of the Property.

(SAR 2385-94.)

## C. District Ranger Larson's Response to Plaintiffs' Request

In responding to Mr. Breaker's request for a special use permit, District Ranger Larson was required by law to consider, at a minimum, certain pre-application, initial screening criteria. See 36 C.F.R. § 251.54. These nine criteria include: (1) whether the proposed use was "consistent with the laws, regulations, orders, and policies establishing or governing" this part of the BWCAW, and (2) whether the proposed use was "consistent or can be made consistent with standards and guidelines in the applicable [Forest Plan]."[3] Id.

---

[3] The other seven initial criteria are:

(iii) The proposed use will not pose a serious or substantial risk to public health or safety.

(iv) The proposed use will not create an exclusive or perpetual right of use or occupancy.

(v) The proposed use will not unreasonably conflict or interfere with administrative use by the Forest Service, other scheduled or authorized existing uses of the National Forest System, or use of adjacent non-National Forest System lands.

(vi) The proponent does not have any delinquent debt owed to the Forest Service under terms and conditions of a prior or existing authorization, unless such debt results from a decision on an administrative appeal or from a fee review and the proponent is current with the payment schedule.

(vii) The proposed use does not involve gambling or providing of sexually oriented commercial services, even if permitted under State law.

(viii) The proposed use does not involve military or paramilitary training or exercises by private organizations or individuals, unless such training or exercises are federally funded.

(ix) The proposed use does not involve disposal of solid waste or disposal of radioactive or other hazardous substances.

§ 251.54(e)(1)(i-ii).  Only a special use request that met all nine of the initial criteria could proceed to a second-level screening.  Id. § 251.54(e)(5.)  If the second-level criteria were met, there was then a separate test to determine adequate access on the merits.  Id. § 251.54(g).  If District Ranger Larson determined that the proposal failed any one of the nine initial criteria, she was to reject and not consider it further.  Id. § 251.54(e)(2).  District Ranger Larson did not make a reasonable use determination of the Property or balance the competing interests of private landowner rights and wilderness preservation.  The parties dispute whether District Ranger was required to do so at the initial stage.

After the investigation, District Ranger Larson concluded that allowing Mr. Breaker to construct a road for motorized travel to the Property failed two of the initial screening criteria, because the proposed use: (1) was not "consistent with the laws, regulations, orders, and policies governing" this part of the BWCAW, and (2) was not "consistent or [able to] be made consistent with standards and guidelines in the applicable [Forest Plan]."  (SAR 2389.)  District Ranger Larson determined that granting motorized access would be inconsistent with applicable laws, regulations, orders, and policies because:

   (a) road access had not been granted to other similarly situated landowners
       within Superior National Forest;

   (b) historical access to this particular property did not include a road;

   (c) constructing and maintaining a road would be inconsistent with the
       wilderness value of opportunities for solitude; and

   (d) constructing and maintaining a road would be inconsistent with the need
       to allow wilderness to remain "untrammeled," or generally free from

---

Id. § 251.54(e)(1)(iii-ix).

sights and sounds made by man.

(SAR 2390.) In addition, District Ranger Larson determined that granting motorized access would not be consistent with standards and guidelines contained in the 2004 Forest Plan for the Superior National Forest because, "among other reasons, this part of the BWCAW was managed as a semi-primitive wilderness area, which does not allow motorized vehicles." (Id.) Consequently, District Ranger Larson did not send Mr. Breaker an application for a special use permit.

On July 28, 2005, District Ranger Larson sent Mr. Breaker two letters: one informing him of her decision not to issue the requested special use permit, and the other granting him permission to access his private property in the BWCAW, using non-motorized or non-mechanized methods, without a visitor's permit. (AR 5-6.) The longer letter stated that Mr. Breaker already had reasonable access to his Property because there were possible ways to reach it from public beginning points. (AR 5.) The first access point was the pull-off located south of the Echo Trail where it crosses the Portage River. (Id.) District Ranger Larson indicated that the site was used by the "general public for dispersed camping and Portage River access." (Id.) District Ranger Larson further stated that the existing parking site and the Portage River "provide reasonable access to your property." (Id.) The second public access point was the small turnaround area by FR 206A that leads to the "old logging road." (Id.) District Ranger Larson stated that "this old road corridor, along with a place to park a vehicle in the turnaround provide reasonable access to your property." (Id.)

On August 3, 2005, Mr. Breaker responded with objections to District Ranger

Larson's letter. (AR 7-8.) These objections suggested that water access was not feasible and the parking locations were unsafe. Mr. Breaker also stated that the "only access" to the Property he would "deem adequate would be reestablishing the old road to the site and using vehicles to get to my Property." (AR 7.)

On October 26, 2005, District Ranger Larson sent Mr. Breaker another letter, reflecting a reconsideration of her initial decision. (AR 9-10.) This letter elaborated on the prior letter indicating her "determination that motorized road access to [the Property] would impose long lasting negative impacts to the wilderness resource and that motorized access has not been established as a historical use of access" to the Property. (AR 10.) The letter also repeated her prior conclusion that Mr. Breaker already had adequate access "by the way of the Portage River (spring, summer, fall) and an overland walking trail (year-round), both of which have parking areas located off main roads open for public use . . . ." (AR 9-10.)

On November 6, 2005, Mr. Breaker challenged District Ranger Larson's decision, clarifying that his request was to "reopen the road to my property, put a gate at the entrance to the road, and keep it locked except for authorized users." (AR 12.)

On December 8, 2005, District Ranger Larson sent Mr. Breaker a final letter. (AR 13.) This letter stated that she had "thoroughly re-reviewed" the situation and would "stand by" the determination in her October 26, 2005, letter. (Id.)

In September 2009, Mr. Breaker offered to swap the Property and others that he owned with the Forest Service before beginning the instant litigation. (SAR 2036-45.) The Forest Service rejected Mr. Breaker's exchange offer. (SAR 2034-35.)

### D.  Letter from District Ranger Tim Sexton

On July 11, 2011, LaCroix District Ranger Tim Sexton, District Ranger Larson's successor, sent Plaintiffs a letter.  (SAR 1605.)  This letter invited Plaintiffs to apply for a special use permit to create an authorized walking trail to the Property, or alternatively, to create maintained portages along the Portage River.  (Id.)  The letter enclosed a permit application form and indicated a willingness to help Plaintiffs locate appropriate routes.  (SAR 1605-10.)  To date, Plaintiffs have not submitted an application.

### E.  Private Properties Within the BWCAW

There are currently thirteen private properties within the BWCAW.  (SAR 1929, 1996-97, 2370-72.)  Six of these properties have road access and significant improvements on them.  (SAR 2370-72.)  These six are part of a recreational community that existed before passage of the 1978 BWCAW Act, which severed these properties from the rest of the area.  (SAR 2372.)  Properties of this type in the BWCAW are the "exception to the rule."  (Id.)   Five additional parcels of the thirteen total have some type of improvement on them, and two have no improvements at all.  (SAR 2370-72.)

## III.    DISCUSSION

### A.  Motion to Dismiss

The Court first addresses Defendants' motion to dismiss, because it implicates subject matter jurisdiction.  See Sturge v. Nw. Airlines, Inc., 658 F.3d 832, 836 (8th Cir. 2011).

### 1.  Standard of Review

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a party may

move to dismiss a complaint for lack of subject matter jurisdiction. When considering a Rule 12(b)(1) motion, a district court may consider matters outside the pleadings. Satz v. ITT Fin. Corp., 619 F.2d 738, 742 (8th Cir. 1980). "[N]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist." Osborn v. United States, 918 F.2d 724, 730 (8th Cir. 1990).

### 2. Subject Matter Jurisdiction

Defendants argue that this Court lacks subject matter jurisdiction because: (1) plaintiffs lack standing, (2) the case is unripe, and (3) the case is partially moot. (Mem. in Supp. of Defs.' Mot. to Dismiss or for Summ. J. at 44-49 [Doc. No. 46].) The Court respectfully disagrees with Defendants on all three points.

### a. Standing

Standing is a jurisdictional prerequisite that must be resolved before reaching the merits of a suit. City of Clarkson Valley v. Mineta, 495 F.3d 567, 569 (8th Cir. 2007). If a plaintiff lacks standing, a district court has no subject matter jurisdiction. Thus, a standing argument implicates Rule 12(b)(1). Faibisch v. Univ. of Minn., 304 F.3d 797, 801 (8th Cir. 2002). Standing requires that: (1) an injury be concrete and particularized, actual or imminent, not conjectural or hypothetical, (2) the injury be fairly traceable to the challenged action of the defendant, and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Turkish Coal. of Am., Inc. v. Bruininks, 678 F.3d 617, 621 (8th Cir. 2012).

### i. Whether Marty Breaker Enterprises, Inc. was Able to Purchase the Property from Charles Salvi

Defendants first argue that Plaintiffs lack standing because they do not own the Property. (Mem. in Supp. of Defs.' Mot. to Dismiss or for Summ. J. at 44-47 [Doc. No. 46].) Defendants note that Charles Salvi conveyed the Property to Marty Breaker Enterprises, Inc. on January 23, 2004, a date on which this corporation did not exist. (Id. at 45; SAR 2009.) Defendants cite Stone v. Jetmark Prop., LLC, 733 N.W.2d 480, 487 (Minn. Ct. App. 2007), for the proposition that a non-existent entity cannot take title to land. (Mem. in Supp. of Defs.' Mot. to Dismiss or for Summ. J. at 45 [Doc. No. 46].)

The Court has reviewed the filing history of Marty Breaker Enterprises, Inc. with the Minnesota Secretary of State. (SAR 1998.) This document shows that Marty Breaker Enterprises, Inc. made its original filing as a domestic business corporation on April 14, 1986 and was administratively dissolved on December 31, 1999. (Id.) On December 6, 2012, Marty Breaker Enterprises, Inc. was reinstated. (Id.) Since then and through at least January 10, 2013, it has been an active corporation in good standing. (Id.)

Although Marty Breaker Enterprises, Inc. was administratively dissolved when Charles Salvi conveyed the Property to the corporation on January 23, 2004, the Court declines to find that the corporation could not take title to the Property. In 2012, Marty Breaker Enterprises, Inc. filed for renewal and was reinstated under Minn. Stat. § 302A.821. This statute provides that after administrative dissolution, filing a renewal "returns the corporation to good standing as of the date of the dissolution," "validates contracts or other acts within the authority of the articles," and "restores to the corporation all assets and rights

13

of the corporation to the extent they were held by the corporation before the dissolution occurred." MINN. STAT. § 302A.821(c). Thus, the reinstatement returned Marty Breaker Enterprises, Inc. to good standing as of December 31, 1999, and it validated the conveyance of the Property from Charles Salvi to the corporation.

In addition, the circumstances of Stone are distinguishable. In Stone, an individual conveyed property by a deed naming an LLC as the grantee nearly one year before the LLC formed. 733 N.W.2d at 483-84. One day after the conveyance, the property was mortgaged to a third party. Id. Ultimately, the mortgagee foreclosed the property. Id. The Minnesota Court of Appeals affirmed the district court's decision that the deed was void because the LLC did not exist when the deed was delivered, and there was no requisite intent to convey the property. Id. at 487. By contrast, Marty Breaker Enterprises, Inc. was already formed on January 23, 2004; it was merely dissolved administratively at the time. Moreover, the Personal Representative's Deed indicates clear intent to transfer the Property from Charles Salvi to Marty Breaker Enterprises, Inc., (SAR 2009), and the record does not suggest otherwise. Stone therefore is inapposite.

Accordingly, the Court finds that on January 23, 2004, Marty Breaker Enterprises, Inc. could and did take title to the Property from Charles Salvi. On August 13, 2009, the corporation could and did convey the Property to Plaintiffs. (SAR 2023.)

### ii. Proper Assertion of Interest in the Property

Defendants next argue that Plaintiffs lack standing because they cannot assert the interests of Marty Breaker Enterprises, Inc. (Mem. in Supp. of Defs.' Mot. to Dismiss or for Summ. J. at 44-47 [Doc. No. 46].) Defendants argue that when Mr. Breaker sought the

special use permit in 2005, he did so not in his individual capacity, but rather, as President

of Marty Breaker Enterprises, Inc.  (Id. at 46.)  In addition, the Property remained in the

corporation's name for four more years.  (Id.)  Thus, Defendants contend that any claims

belong to the corporation and not Plaintiffs as individuals.  (Id.)

In opposition, Plaintiffs argue that Mr. Breaker acted in his individual capacity when

he sought the application for a special use permit, because: (1) Mr. Engrav's field report

identifies the Property as the "Marty Breaker Property," (2) Mr. Engrav's notes regarding

his phone conversation with Mr. Breaker made no reference to him acting "in his capacity

as President of MBEI," (3) all communications were between District Ranger Larson and

Martin Breaker, without reference to the corporation, and (4) Mr. Breaker's letters were not

on corporate letterhead and used Mr. Breaker's home address.  (Martin and Heidi Breakers'

Reply Mem. in Supp. of Their Mot. for Summ. J. at 34 [Doc. No. 49].)  Plaintiffs also argue

that the Forest Service has waived its right to object to standing because eight years have

passed since it began processing Mr. Breaker's request.  (Id. at 34-35.)  Alternatively,

Plaintiffs submit that to the extent the claim is the corporation's and the Forest Service has

not waived its objections, Plaintiffs should be allowed to amend the Complaint under

Federal Rule of Civil Procedure 17(a)(3).  (Id. at 36.)

At any time, either party or the Court can raise the issue of subject matter

jurisdiction.  GMAC Commercial Credit LLC v. Dillard Dep't Stores, Inc., 357 F.3d 827,

828 (8th Cir. 2004).  Because standing is a question of subject matter jurisdiction, the Court

rules that the Forest Service has not waived its objections to standing.

Next, the Court finds that Plaintiffs cannot sustain the argument that Mr. Breaker

acted in his individual capacity when he requested a special use permit from the Forest Service. The record shows that on January 23, 2004, Charles Salvi conveyed the Property to Marty Breaker Enterprises, Inc., and on August 13, 2009, Marty Breaker Enterprises, Inc. conveyed the Property to Plaintiffs in their individual capacity. (SAR 2020, 2023.) Thus, when Mr. Breaker requested the special use permit from the Forest Service in 2005, he could only make this request for the corporation, which owned the Property at the time, and not for Plaintiffs in their individual capacities.

Consequently, at issue is whether to permit the joinder of Marty Breaker Enterprises, Inc. as a real party in interest. Rule 17(a) provides that "[a]n action must be prosecuted in the name of the real party in interest." FED. R. CIV. P. 17(a)(1). As to joinder of the real party in interest, the rule further states:

> The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

FED. R. CIV. P. 17(a)(3). The Advisory Committee Notes to Rule 17 explains this joinder provision:

> The provision that no action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed, after the objection has been raised, for ratification, substitution, etc., is added simply in the interests of justice. In its origin the rule concerning the real party in interest was permissive in purpose: it was designed to allow an assignee to sue in his own name. That having been accomplished, the modern function of the rule in its negative aspect is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata.

Courts consider various factors when deciding whether to dismiss an action or to allow joinder of the real party in interest, such as whether the plaintiff engaged in deliberate tactical maneuvering, and whether the defendant would be prejudiced by a substitution. <u>See Esposito v. United States</u>, 368 F.3d 1271, 1276 (10th Cir. 2004) (analyzing substitution of party under Rule 17(a)). Also, relief under Rule 17(a) "should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants." <u>Advanced Magnetics, Inc. v. Bayfront Partners, Inc.</u>, 106 F.3d 11, 20 (2d Cir. 1997).

After reviewing the facts of this case, the Court finds that dismissal for failure to prosecute in the name of Marty Breaker Enterprises, Inc., a real party in interest, would be inappropriate. The record does not show that Plaintiffs engaged in deliberate tactical maneuvering when they sued in their own names based on the mistaken belief that Mr. Breaker requested the special use application in his individual capacity. The Court finds that Mr. Breaker's mistake was not in bad faith. Moreover, the Forest Service would not be prejudiced if Marty Breaker Enterprises, Inc. were joined in the action because the claims and factual allegations would not change. Finally, joinder of Marty Breaker Enterprises, Inc. will protect the Forest Service from a subsequent action by the corporation, and it will avoid the injustice of dismissing Plaintiffs' claims without proceeding to the merits. <u>See Johnson v. Dayton Elec. Mfg. Co.</u>, 140 F.3d 781, 784 (8th Cir. 1998) ("There is a judicial preference for adjudication on the merits."). For these reasons, the Court joins Marty Breaker Enterprises, Inc. instead of dismissing this action altogether.

Because Marty Breaker Enterprises, Inc. could—and did—take title to the Property,

and because the Court joins Marty Breaker Enterprises, Inc. under Rule 17(a)(3), the Court holds that Plaintiffs and Marty Breaker Enterprises, Inc. have standing in this litigation.

### b. Ripeness

Defendants argue that this case is unripe because: (1) there was no final agency action as to Plaintiffs, who sued only in their personal capacities and not on behalf of Marty Breaker Enterprises, Inc., and (2) any arguments about reaching the Property other than reopening the old road for motorized access were not presented to the Forest Service. (Mem. in Supp. of Defs.' Mot. to Dismiss or for Summ. J. at 48 [Doc. No. 46].)  Plaintiffs argue that: (1) they have exhausted their administrative remedies, and (2) the accessibility of the Property via canoe and foot is relevant because the Forest Service put the issue of "adequate access" at the forefront of its decision.  (Martin and Heidi Breakers' Reply Mem. in Supp. of Their Mot. for Summ. J. at 37-38 [Doc. No. 49].)

An issue is not ripe for review absent a "showing that a live controversy exists such that the plaintiffs will sustain immediate injury from the operation of the challenged [action], and that the injury would be redressed by the relief requested."  Wersal v. Sexton, 674 F.3d 1010, 1018 (8th Cir. 2012).  Before a party can challenge an action by the Forest Service in federal court, it must exhaust administrative remedies.  Friends of the Norbeck v. United States Forest Serv., 661 F.3d 969, 974 (8th Cir. 2011) (citing 7 U.S.C. § 6912(e) as codifying the judicial doctrine of exhaustion).  Special use permit determinations by the Forest Service are reviewable by this Court.  See KOLA, Inc. v. United States, 882 F.2d 361, 364 (9th Cir. 1989) (noting that "the Regional Forester's decision to issue a special use permit is subject to judicial review where review involves an inquiry into whether the

proper factors were considered by the Forestry Service").

First, the Court finds that District Ranger Larson's rejection of Mr. Breaker's request for a special use permit is judicially reviewable as a final agency action. The Forest Service denied Mr. Breaker's request on July 28, 2005; October 26, 2005; and December 8, 2005. (AR 5-6, 9-10, 13.) District Ranger Larson's last correspondence to Mr. Breaker stated:

> I have considered whether your proposed use is consistent with laws, regulations, orders and policies and stand by my determination described to you in my last letter dated October 26, 2005. **I do acknowledge that you may not agree with my authority, responsibility and decision to cease any further evaluation or processing of your request, nonetheless it is my decision to do so**.

(AR 13) (emphasis added). The finality of District Ranger Larson's review and her determination is clear from her language here.

Second, because the Court is joining Marty Breaker Enterprises, Inc. as a real party in interest, there is a final agency action with respect to the corporation.

Third, the Court finds that the question of "adequate access" is properly before it. In her October 26, 2005, letter to Mr. Breaker, District Ranger Larson addressed this issue, (1) providing the language of 36 C.F.R. § 251, Subpart D and the Forest Service Manual on what constitutes "adequate access," and (2) stating her determination that Mr. Breaker "currently ha[s] adequate access to your private property by way of the Portage River (spring, summer, fall) and an overland walking trail (year-round) . . . ." (AR 9-10.) Because the Forest Service made a final determination of what constitutes "adequate access," specifically in the context of the Portage River and the old road, this issue is ripe for judicial review.

For these reasons, the Court rejects Defendants' ripeness arguments.

### c. Mootness

Defendants argue that questions concerning the ease or difficulty of walking or canoeing to the Property are partially moot, because the Forest Service expressed its willingness to work with Plaintiffs to construct an improved foot trail or maintain portages for better access to the Property. (Mem. in Supp. of Defs.' Mot. to Dismiss or for Summ. J. at 49 [Doc. No. 46].)

The Court respectfully disagrees. Questions concerning the ease or difficulty of walking or canoeing to the Property are relevant to the Forest Service's determination of whether Plaintiffs have adequate access to the Property by way of the Portage River and the old road. These questions are also relevant to an analysis of what constitutes a "reasonable use" of the Property. Accordingly, the Court finds that these questions are not moot.

## B. Summary Judgment

### 1. Standard of Review

Summary judgment is proper where there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The Court views the evidence and all reasonable inferences drawn in the light most favorable to the nonmoving party. In re Derailment Cases, 416 F.3d 787, 792 (8th Cir. 2005). An issue of fact is genuine when a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The nonmoving party, however, may not rest on mere allegations or denials, but must show a genuine issue of material fact, or that the movant is not entitled to judgment. Wenzel v. Missouri-Am. Water

Co., 404 F.3d 1038, 1039 (8th Cir. 2005).

Judicial review of federal agency administrative decisions is, unless expressly stated otherwise, governed by the Administrative Procedures Act ("APA"). 5 U.S.C. § 706; Friends of Boundary Waters Wilderness v. Bosworth, 437 F.3d 815, 821 (8th Cir. 2006) (citations omitted). Under the APA, courts give great deference to agency determinations and may overturn agency actions only if they are "arbitrary, capricious, or manifestly contrary to the statute." Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837, 842-44 (1984); 5 U.S.C. § 706(2)(A). A decision is arbitrary or capricious if

> the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs contrary to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Bosworth, 437 F.3d at 822. If an agency's decision to which deference is afforded may be supported on any rational basis, it must be upheld. Id. The Court is not free to substitute its judgment for that of the agency. Friends of Boundary Waters Wilderness v. Dombeck, 164 F.3d 1115, 1128 (8th Cir. 1999). Nonetheless, the Court is not compelled to "rubber stamp" administrative decisions that are inconsistent with a statutory mandate or frustrate the congressional policy underlying a statute. Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Relations Auth., 464 U.S. 89, 97 (1983).

### 2. Record on Review

Typically, judicial review under the APA is limited to the administrative record that was before the agency when it made its decision. Voyageurs Nat. Park Ass'n v. Norton, 381 F.3d 759, 766 (8th Cir. 2004). By confining judicial review to the administrative

record, the APA precludes the reviewing court from conducting a de novo trial and substituting its opinion for that of the agency.  Id.

Certain exceptions, however, have been carved from the general rule limiting APA review to the administrative record.  Id. (citing Animal Def. Council v. Hodel, 840 F. 2d 1432, 1436-38 (9th Cir. 1988)).  These exceptions apply under extraordinary circumstances and are not to be invoked casually, unless the party seeking to depart from the record can make a strong showing that the specific extra-record material falls within an exception. Voyageurs, 381 F.3d at 766.  When there is "a contemporaneous administrative record and no need for additional explanation of the agency decision, there must be a strong showing of bad faith or improper behavior before the reviewing court may permit discovery and evidentiary supplementation of the administrative record."  Id.

The parties' record consists of the original and supplemental administrative records. The original administrative record reflects documents "considered by Nancy Larson as the decision-maker, or by District Headquarters staff who provided information to Nancy Larson" in connection to her 2005 decision.  (See Decl. of Tim Sexton ¶ 2.)  It also contains various letters between District Ranger Larson and Mr. Breaker concerning her decision not to issue a special use permit and his responding objections.  (AR 5-14.)  The supplemental administrative record consists of materials produced in connection with this litigation, including an affidavit by Nancy Larson that describes her process of considering Mr. Breaker's request for a special use permit.  (SAR 2385-94.)  Both parties stipulate that the Court may consider the administrative record and the supplemental administrative record. (Joint Stipulation Concerning Administrative Record [Doc. No. 29].)

Defendants represent that District Ranger Larson reached her decision based on the initial screening criteria, and her analysis was not documented beyond the letters she sent to Mr. Breaker. (Mem. in Supp. of Defs.' Mot. to Dismiss or for Summ. J. at 19 [Doc. No. 46].) The Court notes that District Ranger Larson's affidavit describes in detail her consideration of Mr. Breaker's request. To the extent that this document and others in the supplemental administrative record explain the agency's decision more thoroughly, the Court will consider the supplemental administrative record.

### 3. Reasonable Use

The parties dispute whether, at the initial screening stage, District Ranger Larson was required to make a "reasonable use" determination of the Property. (Mem. in Supp. of Defs.' Mot. to Dismiss or for Summ. J. at 30-31 [Doc. No. 46]; Pl.'s Reply Mem. in Supp. of Their Mot. for Summ. J. and in Opp'n to Defs.' Mot. for Summ. J. at 4-6 [Doc. No. 49].) They agree that the applicable laws and regulations governing National Forest lands include the Wilderness Act of 1964, the Alaska National Interest Lands Conservation Act ("ANILCA"), and the implementing regulations pertaining to access to non-federal lands under 36 C.F.R. § 251.

First, under the Wilderness Act, "wilderness" is defined as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." 16 U.S.C. § 1131(c). Areas designated as wilderness under the Act must be managed to preserve their "wilderness character." Id. § 1133(b). Some activities, including the use of motor vehicles, motorized equipment, and other forms of mechanical transport, are banned by the Act, "except as necessary to meet minimum requirements for the

administration of the area for the purpose of this act."  Id. § 1133(c).  This general provision

is coupled with a specific right of adequate access to privately owned land completely

surrounded by areas designated as wilderness.  Id. § 1134(a).  Furthermore, the Wilderness

Act expressly delegates regulatory authority to effectuate access to occupancies in

wilderness areas.[4]  While § 1133(c) provides an exception for activities necessary to meet

the minimum requirements of an area, § 1134(b) empowers the Forest Service to regulate

means of access to occupancies wholly within an area designated as wilderness as

customarily enjoyed in similarly situated areas.

Second, ANILCA provides a right of access to private land in the National Forest

system.  16 U.S.C. § 3210(a).  The right of access granted by ANILCA applies nationwide.

Montana Wilderness Ass'n v. United States Forest Serv., 655 F.2d 951, 957 (9th Cir. 1981).

Under ANILCA, the Forest Service must provide

> . . . such access to nonfederally owned land within the boundaries of the
> National Forest System as the Secretary [of Agriculture] deems adequate to
> secure to the owner the reasonable use and enjoyment thereof: *Provided*, That
> such owner comply with rules and regulations applicable to ingress and
> egress to or from the National Forest System.

Id. § 3210(a).

Third, Forest Service regulations at 36 C.F.R. § 251, Subpart D, implement the right

of access provisions codified in 16 U.S.C. §§ 1134 and 3210.  See 36 C.F.R. § 251.110, et

seq.  These regulations apply to owners of "non-Federal land or interests in land within the

---

[4] "In any case where valid mining claims or other valid occupancies are wholly within a
designated national forest wilderness area, the Secretary of Agriculture shall, by
reasonable regulations consistent with the preservation of the area as wilderness, permit
ingress and egress to such surrounded areas by means which have been or are being
customarily enjoyed with respect to other such areas similarly situated."  Id. § 1134(b).

boundaries of the National Forest System." Id. § 251.111. The standard for access by means consistent to other occupancies similarly situated is also spelled out by regulation. See id. § 293.13.

The two initial screening regulations addressed by the Forest Service, reproduced below, require consistency with all applicable statutes and regulations and the Forest Service Plan:

> (i) The proposed use is consistent with the laws, regulations, orders, and policies establishing or governing National Forest System lands, with other applicable Federal law, and with applicable State and local health and sanitation laws.

> (ii) The proposed use is consistent or can be made consistent with standards and guidelines in the applicable forest land and resource management plan prepared under the National Forest Management Act and 36 CFR part 219.

36 C.F.R. §§ 251.54(e)(1)(i-ii). Not only do the Wilderness Act and ANILCA address the preservation of wilderness character in the National Forest, but they also recognize the competing interests of private landowners' rights. Namely, the Wilderness Act provides that the private owner "shall be given such rights as may be necessary to assure adequate access to such . . . privately owned land . . . ." 16 U.S.C. § 1134(a). And ANILCA requires a consideration of the owner's "reasonable use and enjoyment" of his land in determining access to "nonfederally owned land within the boundaries of the National Forest System." 16 U.S.C. § 3210(a). Thus, even at the initial screening stage, the Forest Service must consider what constitutes a "reasonable use" of the Breakers' property.

To hold otherwise would render the inholder provisions of the Wilderness Act and ANILCA meaningless. Every request for access to privately owned land in the National

Forest affects the wilderness in some way. Under Defendants' position that the Forest Service only needs to consider the impact on wilderness at the initial screening stage, no request for motorized or special access would ever proceed beyond this stage. Congress would not have included the reference to "adequate access" in the Wilderness Act or the reference to "reasonable use and enjoyment" in ANILCA if it intended such a result.

Here, the Forest Service did not make a "reasonable use" determination before denying Plaintiffs' request for a special use permit. District Ranger Larson's letter to Mr. Breaker stated her conclusion that "motorized road access to your property would impose long lasting negative impacts to the wilderness resource," and that "motorized access has not been established as a historical use of access to this privately owned property." (AR 10.) District Ranger Larson's affidavit, provided in this litigation, confirms and elaborates on this explanation. In concluding that granting motorized access would not be consistent with applicable laws, regulations, orders, and policies, District Ranger Larson reasoned that: (1) road access had not been granted to other similarly situated landowners within Superior National Forest; (2) historical access to this particular property did not include a road; (3) constructing and maintaining a road would be inconsistent with the wilderness value of opportunities for solitude; and (4) constructing and maintaining a road would be inconsistent with the need to allow wilderness to remain "untrammeled," or generally free from sights and sounds by man. (SAR 2390.) In determining that granting motorized access would be inconsistent with standards contained in the 2004 Forest Plan for the Superior National Forest, District Ranger Larson reasoned that "this part of the BWCAW was managed as a semi-primitive wilderness area, which does not allow motorized

vehicles." (Id.) Nowhere in District Ranger Larson's correspondence with Mr. Breaker or her affidavit does the Forest Service indicate a consideration of "reasonable use" for the Property.

Accordingly, the Forest Service's failure to consider "reasonable use" of the Property at the initial screening stage supports the Court's finding that the decision to deny Plaintiffs an application for a special use permit was arbitrary and capricious.

### 4. Adequate Access

Plaintiffs argue that the Forest Service acted arbitrarily and capriciously in determining that any access to the Property—namely, via (1) a narrow, overgrown road that does not reach the Property, and (2) the Portage River, which is not navigable for most of the year—is "adequate access" under federal law. (Mem. in Supp. of Martin and Heidi Breaker's Mot. for Summ. J. at 18 [Doc. No. 36].) Plaintiffs also argue that the Forest Service failed to consider their reasonable use and enjoyment of the Property consistent with similarly situated properties. (Id. at 26.) Defendants contend that it was proper to consider the merits of adequate access in connection with the initial screening factors, and the adequate access conclusion was correct on its merits. (Mem. in Supp. of Defs.' Mot. to Dismiss or for Summ. J. at 31 [Doc. No. 46].)

"Adequate access" to an inholding is defined as "a route and method of access to non-Federal land that provides for reasonable use and enjoyment of the non-Federal land consistent with similarly situated non-Federal land and that minimizes damage or disturbance to the National Forest System lands and resources." 36 C.F.R. § 251.111. The "adequate access" standard is higher than one of "any access." Nelson v. United States, 64

F. Supp. 2d 1318, 1325 (N.D. Ga. 1999). Furthermore, the regulations provide criteria for considering whether to grant a special use authorization for access to non-federal lands:

> In issuing a special-use authorization for access to non-Federal lands, the authorized officer shall authorize only those access facilities or modes of access that are needed for the reasonable use and enjoyment of the land and that minimize the impacts on the Federal resources. The authorizing officer shall determine what constitutes reasonable use and enjoyment of the lands based on contemporaneous uses made of similarly situated lands in the area and any other relevant criteria.

36 C.F.R. § 251.114(a).

District Ranger Larson concluded that the Breakers had adequate access to the Property by way of the Portage River and the old road that runs toward the Property. (AR 9-10.) In her affidavit, District Ranger Larson elaborated on the two "possible ways to reach the Property from the Echo Trail" without using a motor vehicle. (SAR 2388.) Regarding the old road, which is "now a narrow trail being kept open only by wildlife" and "led only so far as an adjacent parcel of county tax-forfeited property that lay to the west of the Property," District Ranger Larson understood that to reach the Property via this route, "one would need to travel part of the way by foot through a section of uncharted forest," which was "not uncommon in the BWCAW." (SAR 2388.) Regarding the Portage River, District Ranger Larson stated that one would reach the Property by canoe, which "involved parking at a pull-off area along the Echo Trail just east of the Portage River bridge, and paddling north past several sets of rapids in order to reach the Property." (SAR 2388-89.) District Ranger Larson understood that this route "would not be passable during all seasons of the year," but the circumstances were "not uncommon in the BWCAW." (SAR 2389.) District Ranger Larson concluded that both means of access constituted "adequate access"

28

under the Wilderness Act.  (SAR 2388-89.)

The Court finds that the Forest Service applied the incorrect standard in analyzing the Breakers' request.  The Forest Service determined that the Breakers had adequate access to their property because there are "two possible ways" to reach it from the Echo Trail without using a motor vehicle.  (SAR 2388.)  But the fact that these means are "possible" does not necessarily mean that they are adequate.  Indeed, the record reflects statements by former Forest Service employees that for most of the year, the Portage River is shallow, rocky, and not navigable to the Property.  (AR 212, 214.)  Similarly, the record reflects that the old road connecting to FR 206A and running into the BWCAW toward the Property is a narrow and faint trail, overgrown with trees and brush, kept open by moose and deer.  (AR 3; SAR 1176, 1821-26).  Demonstrated consideration of these facts may have led the Forest Service to conclude alternatively that the Breakers lacked adequate access to their property. The Forest Service acted arbitrarily and capriciously by conflating the "any access" standard with that of "adequate access," and by failing to consider facts that may support a determination of inadequate access.

In addition, the Forest Service did not distinguish between the rights of inholders and the general public.  Rather, District Ranger Larson explained in her affidavit that because the circumstances surrounding the old road and the Portage River as means of accessing the Property were "not uncommon in the BWCAW," both constituted adequate access.  (SAR 2389.)  And in her October 26, 2005, letter to Mr. Breaker, District Ranger Larson stated that "[b]ecause these routes by which you may access your private lands are routes that are also available to the public, there is no need for you to have a special use permit unless you

29

are interested in plowing a parking area for winter use." (AR 10.) But the Forest Service

Manual itself distinguishes between inholders and the general public, noting that for those

owning land completely surrounded by wilderness, the "Regional Forester may provide

these landowners with written permission to use wilderness routes or motorized modes of

travel not available to the general public." U.S. FOREST SERVICE, FOREST SERVICE

MANUAL § 2326.13 (2007), *available at* http://www.wilderness.net/toolboxes/documents/

inholdings/FS%20Inholding%20Regulations,%20Policy,%20Management%20Practices.

pdf. In other words, inholders may be granted more access rights than the general public.

The Forest Service failed to consider this possibility altogether.

Finally, the Forest Service did not consider additional criteria in determining what

constitutes adequate access. Such criteria include a balancing of "the reasonable use and

enjoyment of the land" and that which "minimize[s] the impacts on the Federal

resources." 36 C.F.R. § 251.114(a). In addition, the "authorizing officer shall determine

what constitutes reasonable use and enjoyment of the lands based on contemporaneous

uses made of similarly situated lands in the area and any other relevant criteria." Id. As

discussed earlier, the Forest Service did not make a reasonable use determination. See

supra Section III(A)(3). Although District Ranger Larson cited the portion of 36 C.F.R. §

251.114 stating the required consideration of "uses made of similarly situated lands in the

area," (AR 9-10), the administrative record does not show that she considered the uses

made of the privately owned properties in the BWCAW. At best, the supplemental

record reflects District Ranger Larson's statement in her affidavit that "road access had

not been granted to other similarly situated landowners within Superior National Forest."

(SAR 2390.)  Defendants argue that a two-page typewritten list of the private inholdings and a report by John Vigen, both in the supplemental record, support the Forest Service's consideration of similarly situated properties.  (Mem. in Supp. of Defs.' Mot. for Summ. J. at 34-35 [Doc. No. 46].)  But the two-page list merely reflects the owners, location, and size of the respective private properties in the BWCAW, without any reference to their use.  (SAR 1413-14.)  As for the Vigen report, which analyzes the use of similarly situated properties in the BWCAW, this document was prepared for Defendants' counsel, and the record does not show that the Forest Service reviewed it.  (SAR 2367-73.) Accordingly, the Court finds that the Forest Service did not consider the additional statutory criteria in determining adequate access.

For these reasons, the Forest Service acted arbitrarily and capriciously in denying Plaintiffs an application for a special use permit.  In so ruling, the Court does not determine whether the old road, the Portage River, or any other means provides adequate access to the Property.  The Court is mindful of the fact that agencies are afforded substantial deference, and it does not infringe on the Forest Service's discretion.  Rather, it finds fault with the incorrect "any access" standard applied by the Forest Service, as well as the incomplete evidence and criteria considered by the agency in determining what constitutes adequate access to the Property.  The Court therefore remands the decision to the Forest Service for further proceedings consistent with this opinion.

### 5.  Remedies

Because this Court finds that the Forest Service's denial of Plaintiffs' request for a special use permit application was arbitrary and capricious, the issue of what constitutes an

appropriate remedy remains. Plaintiffs argue that remand is inappropriate because the

Forest Service had "ample opportunity to develop evidence to make necessary

determinations and did not," and "its erroneous decision was not supported by the record."

(Mem. in Supp. of Martin and Heidi Breaker's Mot. for Summ. J. at 40 [Doc. No. 36].)

Consequently, Plaintiffs argue that they are entitled to the following declaratory and

injunctive relief: (1) a finding that they do not have adequate access to the Property; (2) a

finding that the reasonable use of the Property is as a single-family residence; and (3)

injunctive relief ordering the Forest Service to issue a special use authorization for

motorized access to the Property—or, in the alternative, ordering the Forest Service to offer

a reasonable exchange of federally owned property desired by Plaintiffs. (Id. at 2, 38.)

### a. Remand and Declaratory Relief

This Court is authorized to "hold unlawful and set aside agency action, findings, and

conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A). An inadequately supported rule, however,

need not necessarily be vacated. Allied-Signal, Inc. v. United States Nuclear Regulatory

Comm'n, 988 F.2d 146, 150-51 (D.C. Cir. 1993). Whether to do so is in the reviewing

court's discretion. Relevant factors include the severity of the order's deficiencies and the

disruptive consequences of an interim change that may itself be changed. Id. (citing Int'l

Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin., 920 F.2d 960,

967 (D.C. Cir. 1990)).

Here, certain issues require different and more thorough analysis than the Forest

Service afforded them. At the initial screening stage, the Forest Service failed to consider a

reasonable use of the Property. And in analyzing "adequate access," the Forest Service erred in several ways. First, the agency applied an "any access" standard rather than the more stringent and correct "adequate access" standard. Second, the administrative record does not show that the Forest Service considered facts concerning the condition of the old road and the navigability of the Portage River, which may support a finding of inadequate access to the Property. Third, the Forest Service failed to consider the possibility that inholders may be granted more access rights than the general public. Fourth, the Forest Service did not consider statutory criteria in determining what constitutes adequate access, namely "reasonable use and enjoyment of the lands based on contemporaneous uses made of similarly situated lands in the area." 36 C.F.R. § 251.114(a).

In the Court's preliminary assessment, these errors are not severe enough to set aside the existing decision; they are likely to be corrected on remand with this Court's guidance. In addition, the primary interim change requested by Plaintiffs—ordering the Forest Service to grant a special use permit for motorized access to the Property—will pose disruptive consequences to the wilderness area that may be for naught if the Forest Service, on remand, returns to the same conclusion. Thus, the Court does not vacate the Forest Service's decision and remands the case for further action consistent with this decision.

In remanding, the Court does not require the Forest Service to modify the outcome, although it may certainly do so. For now, the Court declines to impose a time limit on the agency, but if the Forest Service unnecessarily delays in its decision-making, either party may seek an order setting such a deadline. Because the Forest Service's reconsideration of the matter shall find (1) whether Plaintiffs have adequate access to the Property, and (2)

what constitutes a reasonable use of the Property, the Court declines to grant the declaratory relief sought by Plaintiffs.

### b.  Injunctive Relief

As for the injunctive relief sought by Plaintiffs, the Court notes that an injunction is a "drastic and extraordinary remedy, which should not be granted as a matter of course." St. Paul Branch of the Nat'l Ass'n for the Advancement of Colored People v. United States Dep't of Transp. 764 F. Supp. 2d 1092, 1118 (D. Minn. 2011) (citing Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2761 (2010)).  An injunction is warranted where a plaintiff demonstrates: (1) it has suffered irreparable harm; (2) remedies at law are inadequate to compensate for the harm; (3) the balance of equities weigh in plaintiff's favor; and (4) the injunction is in the public interest.  See Monsanto, 130 S.Ct. at 2756; Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (stating the Eighth Circuit's formulation, which requires showing the likelihood of success on the merits).

Plaintiffs argue that: (1) they can demonstrate success on the merits of their claim that the Forest Service acted arbitrarily and capriciously; (2) there is irreparable harm to their property rights, because without a special use application approved by the Forest Service, they cannot use, enjoy, or exchange their Property with the Forest Service; (3) the balance of hardships weighs in their favor because only the Wilderness Act, ANILCA, and the accompanying regulations in 36 C.F.R. § 251, Subpart D protect their right to access their inholding, and a remand to the Forest Service risks a "never ending loop from which [the Breakers] would never receive justice"; and (4) the public interest protects private property rights.  (Martin and Heidi Breakers' Reply Mem. in Supp. of Their Mot. for

Summ. J. at 29-31 [Doc. No. 49].)  In opposition, Defendants argue that: (1) Plaintiffs have made no showing of irreparable harm; (2) remedies at law are adequate because economic injuries do not generally support injunctive relief; (3) the balance of equities weighs in favor of maintaining the wilderness character of the area; and (4) the public interest discourages the agency from granting a permit for a road through the wilderness.  (Mem. in Supp. of Def.'s Mot. to Dismiss or for Summ. J. at 42 [Doc. No. 46].)

The Court agrees with Plaintiffs that they have shown success on the merits of their claim that the Forest Service acted arbitrary and capriciously.  The Court, however, is not convinced that the other factors for an injunction are met.  For instance, there is not irreparable harm to the Breakers' property rights because the special use authorization for motorized road access is not the only means for them to access the Property.  The Forest Service invited Plaintiffs to apply for a special use permit to create an authorized walking trail to the Property, or alternatively, to create maintained portages along the Portage River. (SAR 1605.)  The Forest Service enclosed a permit application form and expressed a willingness to work with Plaintiffs to locate appropriate routes.  (SAR 1605-10.)  To date, Plaintiffs have not submitted an application.

In addition, the remedies at law are adequate and relatedly, the balance of hardships does not weigh in Plaintiffs' favor.  Plaintiffs claim that they have "no other safeguards for their interests save the Court" because in their view, the Forest Service "acted willfully and neglectfully" and "refused to apply" the Wilderness Act.  (Martin and Heidi Breakers' Reply Mem. in Supp. of Their Mot. for Summ. J. at 30 [Doc. No. 49].)  The Court has reviewed the Forest Service's correspondence with the Breakers and notes that although

35

District Ranger Larson's analysis was incomplete, it does not show a willful or neglectful refusal to apply the applicable regulations. (AR 5-6, 9-10, 13-14.) The Forest Service's investigation of Mr. Breaker's request consisted of conversations with employees at the Superior National Forest headquarters, aerial views of the relevant area by Mr. Engrav and Mr. Toot, and review of research and court decision summaries on access to private inholdings in the wilderness. The Court has faith that with the guidance of this opinion, the Forest Service will render a thoughtful and complete reconsideration of this matter.

Moreover, the Court notes that the public interest factor does not weigh in favor of Plaintiffs or Defendants, because there is a public interest in protecting both the wilderness character of the BWCAW and the interests of private landowners.

Finally, the Court distinguishes the injunctive relief awarded in <u>Nelson v. United States</u>, where complying with the injunction required removing two gate barriers that had been erected over a pre-existing road. 64 F. Supp. at 1320, 1326. Essentially, such compliance restored the status quo as it existed before the Forest Service decided to close the road. <u>Id.</u> Here, by contrast, the Breakers' request for permission to construct a road through the wilderness for motorized use would be unprecedented on the Property. District Ranger Larson made this point in her decision: "When you purchased this property, there were no established rights or routes to access the property with a motorized roadway." (AR 10.) Where motorized access to the Property did not exist historically, the Court declines to grant the injunctive relief requested here.[5]

---

[5] The Court also declines to order the Forest Service to offer a reasonable exchange of federally owned property, because Plaintiffs have not identified authority in support of

For these reasons, the Court does not vacate the Forest Service's decision at this time, remands the case to the Forest Service for further proceedings consistent with this opinion, and denies the declaratory and injunctive relief sought by Plaintiffs.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  Plaintiffs' Motion for Summary Judgment [Doc. No. 34] is **DENIED IN PART** and **GRANTED IN PART**;

2.  Defendants' Motion to Dismiss or for Summary Judgment [Doc. No. 44] is **DENIED IN PART** and **GRANTED IN PART**;

3.  The Forest Service's decision was arbitrary and capricious; and

4.  The case is **REMANDED** to the Forest Service for further proceedings consistent with this opinion.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:          September 30, 2013          s/ Susan Richard Nelson
                                            SUSAN RICHARD NELSON
                                            United States District Court Judge

---

this request.